1       **UNITED STATES DISTRICT COURT**

2       **DISTRICT OF NEVADA**

3    **THE HON. KENT J. DAWSON, U.S. DISTRICT JUDGE, PRESIDING**

4

5   DOES 1-4,                    )
                                 )
6              Plaintiffs,       ) **Case No. 2:09-cv-1083-KJD-PAL**
                                 )
7        vs.                     )
                                 )
8   U.S. ATTORNEY, DISTRICT OF   )
    NEVADA,                      )
9                                )
               Defendant.        )  **C E R T I F I E D   C O P Y**
10  _____ )

11

12

13           **REPORTER'S TRANSCRIPT OF MOTION HEARING**

14                 Tuesday, September 29, 2009

15

16  APPEARANCES:

17  For the Plaintiffs:    **MARGARET A. MCLETCHIE, ESQ.**
                           **JUDY C. COX, ESQ.**
18                         American Civil Liberties Union of Nevada
                           732 South 6th Street
19                         Las Vegas, Nevada 89101
                           (702) 366-9055
20

21  For the Defendant:     **PETER S. LEVITT, AUSA**
                           **ERIC JOHNSON, AUSA**
22                         United States Attorney's Office
                           333 Las Vegas Boulevard South, Suite 5000
23                         Las Vegas, Nevada 89101
                           (702) 388-6336
24

25  Court Reporter:    Felicia Rene Zabin, FCRR, RPR, CCR 478

1      **LAS VEGAS, NEVADA; TUESDAY, SEPTEMBER 29, 2009; 10:38 A.M.**

2                              --oOo--

3                         **P R O C E E D I N G S**

4         THE CLERK:  2:09-cv-1083-KJD-PAL, DOES 1-4 versus U.S.

5   Attorney, District of Nevada.

6         Counsel, please enter your appearances for the record.

7         MR. LEVITT:  Peter Levitt for the United States, your

8   Honor.  With me today is Supervisory Assistant U.S. Attorney

9   Eric Johnson.

10        MS. McLETCHIE:  Maggie McLetchie from the ACLU of

11  Nevada for DOES 1-4.  And this is Judy Cox, another attorney at

12  the ACLU of Nevada.

13        THE COURT:  Thank you.

14        I'd like to -- if we can, I'd like to deal with the

15  Second Motion to Unseal Sealed Documents.  In particular, we're

16  discussing Document Number 30, which is the Government's reply.

17  The Court recognizes that the Government has filed under seal

18  some documents as to avoid disclosure of matters before the

19  Grand Jury.

20        With respect to the Government's reply, is there a

21  reason that that needs to continue to be sealed?

22             (Discussion between Government counsel.)

23        MR. LEVITT:  Your Honor, that's vouchsafe to the

24  Court's sound discretion.

25        THE COURT:  Okay.

1    Well, the disclosure that I see in here that might
2 hinge on the issue of whether or not disclosure is
3 appropriate -- and I appreciate the fact that the Government has
4 acted conservatively in its approach to matters that may affect
5 the Grand Jury process -- the disclosure is that there is a
6 current investigation ongoing on the two commentators who are
7 the subject of the Superseding Subpoena.
8    If -- if that -- if disclosure of that is not going to
9 affect the Grand Jury process, the Court is inclined to unseal
10 the Government's reply.  And, leaving it -- having left it to my
11 discretion, the Court unseals Docket No. 30.
12    Now, I have read the -- the moving papers.  I've read
13 the opposition.  I've read the Government's reply and the DOES'
14 surreply to the motion. And I'm familiar with -- with the
15 arguments going back and forth and the case law that has been
16 cited, both in support of the Motion to Dismiss and in
17 opposition to the Motion to Dismiss.
18    The case law is interesting.  I'm aware that there is
19 an exception to the mootness doctrine.  And what I see here is a
20 unique set of facts that are related to the -- the jury trial
21 process where some statements -- statements were made that dealt
22 with the jurors and the prosecutors in the case against Robert
23 Kahre.
24    The fact that a trial was ongoing when that happened
25 presents particular concerns for the Court because the -- the

1  comments might or might not have had an impact on the outcome of
2  that case.  What -- what I see the situation to be now is that
3  the case has concluded.  The jury returned a verdict of
4  conviction on most of the counts that were involved in that
5  trial.  And so the potential threat to the -- to the jury trial
6  process no longer exists because the verdict is in and the jury
7  has been discharged.  And, in -- in that set of facts, we can
8  look back at the statements that were made and they may or may
9  not have been interpreted correctly as threats depending on who
10 made the statements, what was said, where it was said, and when
11 it was said.
12         I've already pointed out that the statements were made
13 during a jury trial that was ongoing before Judge Ezra.  Who
14 said it is a question.  It is important as to who said it
15 because, as we all know, these cases attract varied following.
16 Some of the individuals, based on the Court's experience, are
17 not completely balanced.  Some of -- have potential that we
18 would not know without an investigation.  Some people are just
19 outraged at how their tax dollars are spent and it is simply
20 venting with no threat.  But, without knowing who said it, it's
21 difficult to know whether it is a threat or just someone blowing
22 off steam.
23         What is said, I think, is important.  We know what was
24 said.  There's no dispute about that.  We know that it was said
25 during the course of a trial and we know that it was said in a

1  public manner, that is, it was sent out electronically via
2  e-mail and to others.
3           Without giving the Government the opportunity to
4  investigate that -- or the Grand Jury the opportunity to
5  investigate, there is no way of telling whether it is an actual
6  threat or just someone letting off steam.
7           I think the -- the *Review-Journal*, in its -- its
8  decision to release the information -- the limited information
9  that was sought by the Superseding Subpoena, must have evaluated
10 this issue and decided that it was close enough of a call that
11 they would release the information because the *Review-Journal* is
12 known to be pretty valiant in protecting First Amendment
13 freedoms.
14          The judge in the case, Judge Ezra, discussed the
15 definite possibility that it could be interpreted as a threat
16 and he took time out to question one of the jurors that had
17 become aware of the article and to address the concerns.
18          The threat is not necessarily to the prosecutor or even
19 to the jurors, but it is a threat to the jury trial process that
20 must be protected.  And, because the jury trial is over, the
21 Court does not see this as a case where there is a danger of
22 repetition.  The Court does not believe that there is any- --
23 anything left to save this -- this case from application of the
24 mootness doctrine.
25          The Government's interest in protecting the jury trial

1  process, its participants, and impartiality have to take
2  precedence, at least to the extent of their ability, to
3  investigate who made the statement and what the intent was.
4  And, accordingly, the Court is going to grant the Motion to
5  Dismiss.
6       I will have an order out later today.  I believe
7  that -- that with the termination of the trial that the threats
8  to the integrity of the legal system are -- are passed and that
9  there is -- there has been an appropriate response to the
10 potential threats that have been made through the issuance of
11 the Superseding Subpoena.
12      The Court, accordingly, denies the application to quash
13 the subpoena.  And the Court finds that the plaintiffs have not
14 demonstrated that compliance with the Superseding Subpoena would
15 be unreasonable or oppressive under the specific facts of this
16 case in its present posture or that the *Review-Journal*'s actual
17 compliance with the Superseding Subpoena does not render the
18 Motion to Quash moot.  So that will be the order.
19      Are there any matters that remain undealt with with
20 respect to the motion to dismiss or the case in general?
21      MR. LEVITT:  In the wake of your Honor's ruling,
22 there's nothing further to be dealt with.
23      THE COURT:  Ms. McLetchie or Ms. Cox, are there any
24 matters that the Court has not addressed?
25      MS. McLETCHIE:  There are no additional matters, but I

1  would like to be heard, just for the record, on my --
2          THE COURT:  You may --
3          MS. McLETCHIE:  -- points on the --
4          THE COURT:  -- be heard, yes.
5          MS. McLETCHIE:  -- Motion to Dismiss.
6          THE COURT:  Sure.
7          MS. McLETCHIE:  Thank you, your Honor.  Thank you for
8  allowing me to speak and thank you also for allowing extensive
9  briefing on this issue.  I appreciate it.
10         First of all, just at the outset, the *Review-Journal*'s
11 decision is not dispositive.  The Ninth Circuit had held that
12 third parties have standing to challenge subpoenas for the very
13 fact that the person who receives the subpoena cannot be
14 expected to face governmental sanctions and contempt of court
15 just because they -- because a third party's interests are at
16 stake.
17         In addition, I understand your point of view on the
18 potential threats and the appropriateness of the response.
19 However, those are -- those are the core issues in this case
20 which we're not getting a chance to address here because of the
21 Motion to Dismiss.  And, from the ACLU's perspective, this was
22 not an appropriate response.  In particular, the first -- the
23 first subpoena was not an appropriate response.  And, in our
24 view, both subpoenas violated the First Amendment and both
25 subpoenas are still live because in the First Amendment context

1  when the Government engages in activity, like issuing subpoenas
2  trying to unmask its anonymous critics, there's a chilling
3  effect that has ongoing effects on the public, including the
4  DOES.
5           Just a -- just a few more points for the record.
6           I think that the defendants misconstrue the nature of
7  this action in their briefing.  And I'd like to clarify that
8  this case is not simply about the propriety of the investigation
9  by the Grand Jury or any -- any further criminal prosecution.
10 They suggest that any arguments, that -- that the subjects of
11 the investigation and for people that might end up being
12 prosecuted because of their statements, they can raise those
13 issues in the criminal proceeding.  But First -- First Amendment
14 juris prudence is extremely clear that you need not face
15 criminal prosecution before you challenge a government action.
16 All you need to show is a credible threat of government
17 enforcement and an intent to engage in a course of conduct
18 affected with the constitutional interest.
19          In the ACLU's view, this is a live controversy.  Before
20 we even get into the "evading review, yet capable of repetition"
21 doctrine, this is still a live controversy in the first place
22 because of the ongoing chilling effect that I mentioned.
23          First, withdrawing a subpoena does not moot a challenge
24 to its constitutionality.  So the fact that the Government
25 decided to withdraw the first subpoena and replace it with a

1  revised one does not moot the first -- the challenge to the
2  first subpoena. And the challenge is a challenge to both
3  subpoenas.
4         THE COURT: Well, I will -- for the record, I have no
5  problem finding that the first subpoena was overbroad and I will
6  be willing to put that in my order.
7         MS. McLETCHIE: Well, I appreciate that very much. I
8  think where we disagree is that the ACLU and the DOES are still
9  concerned about the ongoing harm from the fact that such a
10 subpoena was issued. But I think a court order -- a court order
11 as to the problematic nature of that first subpoena would
12 certainly be helpful.
13         But, even with respect to the second subpoena, it is
14 the ACLU's view the two comments in that -- sought in that
15 subpoena and that action were not true threats and that action
16 also violated the First Amendment.
17         THE COURT: How would they know that they are not true
18 threats without knowing who made them?
19         Let me give you an example. Let's -- let's assume that
20 in the case of someone yelling "fire" that the person is the
21 usher in the theater and then let's assume that it's an arsonist
22 yelling "fire." There is a difference and there's a difference
23 in -- in the time and circumstance in the case of a crowded
24 theater or an empty theater. In one instance, it's okay,
25 possibly it's not even harmful, if the arsonist is yelling

1  "fire" in an empty theater --

2          MS. McLETCHIE:  Um-hum.

3          THE COURT:  -- as much as it is in a crowded theater

4  where people can be, you know, stampeded.  But it seems to me

5  that without knowing who made the statement --

6          MS. McLETCHIE:  Um-hum.

7          THE COURT:  -- you don't know whether to take it

8  seriously.  Getting a little closer to home, if it's someone who

9  has a record, like attempting to shoot the president, that is,

10 you know, making a statement --

11         MS. McLETCHIE:  Um-hum.

12         THE COURT:  -- that the prosecutor should not make it

13 to his next birthday versus someone who's just sick of

14 government waste, you got to know who made the statement.  And

15 how do you find that out without using the investigative process

16 of a subpoena?

17         MS. McLETCHIE:  I think, though, what -- I understand

18 your points, your Honor -- but I think what the law does not

19 allow with respect to the U.S. Attorney's Office power to issue

20 Grand Jury subpoenas, they're not allowed to go on a fishing

21 expedition to find out who the identities of all these possible

22 comments are.  If they had some other information, for example,

23 if somebody's an arsonist and they have information about this

24 person being an arsonist, that's one thing.  But you can't look

25 at every comment anybody makes to figure out:  Okay.  Are they

1  really a criminal?  Are they really intending criminal activity?
2         And, in our view, the kind of comment that was made is
3  exactly the kind of/sort of hyperbolic rhetoric that's on the
4  *Review-Journal*'s Web site all the time, most often, I think,
5  actually about the ACLU.  But --
6         THE COURT:  Sometimes about judges.
7         MS. McLETCHIE:  That's true.  I think -- I think we're
8  more -- even more unpopular usually though.
9         THE COURT:  Okay.
10        MS. McLETCHIE:  In any case, it's the kind -- from the
11 surface of those comments, they are conditional, which is
12 something the Supreme Court has looked at when trying to
13 determine whether something is a true threat, and they are just
14 of the nature that's maybe combative and may not be the way that
15 you and I would like to engage in discourse but they are,
16 nonetheless, protected by the First Amendment.
17        So I don't think that just because something might --
18 somebody might actually mean something bad one day should the
19 government be able to unmask the identities of all the critics.
20 And I think we have to remember the nature of that dialogue and
21 that debate on the site.  While bombastic, it was definitely
22 core political speech, which is exactly the kind of core First
23 Amendment political speech, critical of the government, that has
24 been protected even longer than the Constitution.
25        THE COURT:  I think it was more than criticism.  I

1   think it was a -- it was matters that could be determined a
2   threat to the participants in the jury trial.  And it certainly
3   addressed the participants:  It's addressed the prosecutor; it
4   addressed the jury.  And it was during the -- during the process
5   which goes back to my analogy of when something is said --
6           MS. McLETCHIE:  Um-hum.
7           THE COURT:  -- also is, you know, important in
8   determining what the potentiality is.
9           So it may be a chicken-and-egg situation where
10  there's -- you know, depending on who it is that's making the
11  statement and when and where that it might be harmless
12  criticism.  And certainly, you know, that's the nature of our
13  society is people get criticized.  They get criticized publicly:
14  sometimes by the Ninth Circuit, sometimes by -- by just people
15  who don't understand everything that's going on, and sometimes
16  justifiably by people who do know what's going on.
17          So, yeah, the -- the question of how to get it, who's
18  making it, and when it's made and all those things I think goes
19  into the decision in trying to determine whether what's being
20  done is reasonably and whether it's a justifiable encroachment
21  on the right to free speech.
22          And, in this case, unfortunately, you can't change the
23  facts.  It did happen during the jury trial and the words you're
24  stuck with.  So I understand your arguments.  Yes, absolutely.
25  And so --

1          MS. McLETCHIE:  Well -- obviously, your Honor, I
2  respectfully disagree as to whether they were true threats and
3  whether the second subpoena was proper.  But, moving along to
4  the issues that are before us today --
5          THE COURT:  Yes.
6          MS. McLETCHIE:  -- the mootness issue, again, as I
7  pointed out, I think these issues are still live because of the
8  ongoing chilling effect.  And I want to point out the defendants
9  bear a strong burden here of showing mootness, the *Oregon
   Advocacy* case, for example.  They have to show that absolutely
   no effective relief is possible.

           And, while the Government relied, in our view, on sort
   of stock mootness cases and just summarily argued that this is
   moot, we actually cited to a number of cases -- for example, the
   Supreme Court case, *Church of Scientology* -- that actually
   talked about an IRS summons that was complied with by the party
   that it was issued to.  But the Supreme Court held that,
   nonetheless, the appeal was not moot because the Court could
   render partial relief by ordering return or destruction of the
   tapes that were handed over.  Here your Honor could order --
   after we had a hearing on the actual substantive issues, your
   order could certainly order information be destroyed or handed
   back to the *R-J*.

           So, in our view, these cases establish and support our
   contention that these are live issues.  But, even if the

defendant -- the DOES do not have a current, live personal stake in the issue, which we think they do, the doctrine of "capable of repetition, yet evading review" we think squarely applies. There are cases that talk about subpoenas and there are cases that talk about ongoing criminal proceedings and the press being excluded from them or having a gag order being placed on them. And both those sorts of proceedings have been held by courts to be of inherently short duration that fall within -- fall within the doctrine.

With respect to the second prong, the harm is certainly capable of repetition. And this is a very heavy burden that the defendants bear here. They have to show that there is no reasonably expectation that the wrong will recur and we think it is possible that it will recur. While this -- while the trial may be over, for example, in the Kahre case, sentencing is -- is still going to occur and the case may be appealed. So, even within the Kahre proceeding, there may be further comments, I would imagine, from DOES.

And, in addition, DOES are the sorts of people who comment on ongoing cases all the time. Should another tax case come up, it is highly likely that they would recomment and it's possible that the Government would issue another subpoena. They issued two in this case. The first one they issued was way out of line. It's very possible.

And cases, I think, also support our contention that

it's not enough for the Government to say, oh, no, no, no, we won't do this anymore. Along the lines of the cessation doctrine, it's not enough for the Government to say on their own: We're not gonna do this anymore. The question is: Would somebody reasonably expect that more subpoenas would occur?

This case has gotten a fair amount of attention, this proceeding actually, and I think because of the *Review-Journal*'s bravery in running the first piece about the subpoenas and I think the public is keenly aware of the fact that while they think they can comment anonymously on the *Review-Journal* that the Government may issue subpoenas to get their information when they criticize the government.

Under very similar circumstances, courts have found that controversies were either lie or capable of repetition, yet evading review. I mentioned some of the cases regarding criminal proceedings.

*Press-Enterprise v. Supreme Court of California* involved a press closure order during the pendency of a criminal proceeding and even after the criminal proceeding. The Supreme Court held that the issue was not moot because they could reasonably expect it to be subject to another closure order.

Again, here the DOES, like the press, are watchdogs. And so, like the press that might comment on another criminal proceeding, the DOES may very well comment on another criminal proceeding, probably particularly one about tax issues.

In the *U.S. EPA v. Alyeska Pipeline* case, the Supreme Court pointed out that it was not moot and because this was the -- precisely because of the need for prompt response to subpoenas. And thus the challenged subpoena in that case was held capable of repetition, yet evading review.

In the *Olqgues* case, which is a Ninth Circuit case, the United States Attorney's Office started investigation into voter fraud allegations. The Ninth Circuit held that while the U.S. Attorney's Office terminated the investigation the issue is not moot and it's because of the intimidating effect, the understandable resulting insecurity and exercising the rights at issue, which included First Amendment rights, and the ongoing chilling effect.

So this is very similar, we think, as here where the -- where the criminal proceeding might be over; the first subpoena might be withdrawn but there is still an intimidating effect; First Amendment rights are still at issue and people may be understandably insecure about exercising their First Amendment rights. I won't go into all the other cases, but *Nebraska Press* is another case about the press during a criminal case.

In closing, I'd like to also just point out that in the ACLU's view this is a really exceptional case. We don't usually know necessarily when the United States Attorney's Office issues -- issued subpoenas. We have got a rare glimpse into this process because of the *Review-Journal*'s decision to

publicize the matter. And there's very important issues here.

I understand the concerns that your Honor was discussing with respect to the need to keep the jury safe and to have criminal proceedings be able to proceed in good fashion. In addition, though, there's also First Amendment rights here -- at stake here. And so we think these are very important issues. And the existence -- the Ninth Circuit and the Supreme Court have both said that the existence of the public interest in having the legality of challenged practices settled militates strongly against a finding of mootness. That's from the *Olqgues* case. They are citing from *United States v. W. T. Grant*, a Supreme Court.

That's all, your Honor. Thank you very much.

THE COURT: All right. Thank you.

Government, any response?

MR. LEVITT: Your Honor, all of the Government's substantive arguments are set forth in our pleadings. We concur with your Honor's ruling.

THE COURT: Okay. All right.

Well, as I said, I'll issue a written order soon; maybe later today. We're at the end of our reporting period tomorrow. So, depending on time, it might be a couple of days. We'll just see how much time we have on this matter and hopefully a delay of a couple of days will not -- will not be injurious to either side.

MS. McLETCHIE:  Thank you, your Honor.

THE COURT:  All right.  Thank you.

We're in recess.

And sorry to keep you waiting so long.  Going through those change of pleas is sometimes very time consuming, especially when translation is necessary.

MS. McLETCHIE:  I did wish I had had more coffee.

(Proceedings concluded at 11:05 a.m.)

--oOo--

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter.


DATED:  November 3, 2009    FELICIA RENE ZABIN, RPR, CCR NO. 478